CITY OF EAST CHICAGO, Indiana, Appellant (Third Party Defendant/Intervening Defendant/Third Party Plaintiff/Counterclaim Plaintiff/Crossclaim Plaintiff),

v.

EAST CHICAGO SECOND CENTURY, INC., Appellee (Plaintiff/Counterclaim Defendant/Crossclaim Defendant),

RIH Acquisitions In, LLC, d/b/a Resorts East Chicago, Appellee (Defendant/Third Party Plaintiff/Counterclaim Plaintiff/Crossclaim Defendant),

Twin City Education Foundation, Inc., and East Chicago Community Development Foundation, Inc., Appellees (Intervening Plaintiffs/Third Party Defendants/Crossclaim Defendants),

Michael A. Pannos and Thomas S. Cappas, Appellees (Third Party Defendants).

No. 49A02–0608–CV–631.

Court of Appeals of Indiana.

Dec. 21, 2007.

Rehearing Denied March 14, 2008.

 

 
 
 

James A. Knauer, William Bock, III, Steven E. Runyan, Kroger, Gardis & Regas, LLP, Steve Carter, Amicus Curiae, Attorney General of Indiana, Thomas M. Fisher, Solicitor General of Indiana, Heather L. Hagan, Deputy Attorney General, Indianapolis, IN, Attorneys for City of East Chicago.

J. Lee McNeely, Brady J. Rife, McNeely, Stephenson, Thopy & Harrold, Shelbyville, IN, Attorneys for East Chicago Second Century, Inc., Michael A. Pannos and Thomas S. Cappas.

Peter J. Rusthoven, Deborah Pollack–Milgate, Paul L. Jefferson, Barnes & Thornburg LLP, Indianapolis, IN, Attorneys for Twin City Ed. Foundation, Inc. and East Chicago Community Development Foundation, Inc.

Norman T. Funk, Rori L. Goldman, Hill, Fulwider, McDowell, Funk & Matthews, Indianapolis, IN, Attorneys for Ind. Gaming Comm.

## OPINION

MAY, Judge.

The City of East Chicago ("East Chicago") appeals the denial of its motion for summary judgment and the dismissal of most of its counterclaims and cross-claims against the East Chicago Community Development Foundation and the Twin City Education Foundation (collectively "the Foundations") and East Chicago Second Century, Inc. ("Second Century"). It also asserts the trial court should not have

consolidated the contract action with the review, in another branch of the same court, of an administrative action involving the same parties.[1]

We affirm in part, reverse in part and remand.

1. Both actions were in the Marion Superior Court. The contract action was before Judge Cale Bradford, and the review of the administrative proceeding was before Judge Robyn Moberly.

2. East Chicago's counsel offers a Statements of Facts that is rife with argument, which is inappropriate in that part of an appellate brief. *See, e.g., County Line Towing, Inc. v. Cincinnati Ins. Co.,* 714 N.E.2d 285, 289–90 (Ind.Ct.App.1999), *trans. denied* 735 N.E.2d 219 (Ind.2000). A Statement of Facts should be a concise narrative of the facts stated in accordance with the standard of review appropriate to the judgment or order being appealed, and it should not be argumentative. *Id.;* Ind. Appellate Rule 46(A)(6). East Chicago's Statement of Facts is, by contrast, a transparent attempt to discredit both the judgment and the opponents' character, and was plainly not intended to be a vehicle for informing this court.

For example, East Chicago's counsel offers as "facts" such argumentative statements as: "[W]hen a [Foundation] board member is 'meticulous in his review of the Foundation's financial documents and bold in his inquiries' a way is found to remove the director from the board," (Appellant's Br. at 6); "there is significant evidence of mismanagement of the funds entrusted to the Foundations and Second Century," (*id.* at 7); "the Foundations circumvent IRS regulations," (*id.*); "review of the Foundations' 2003 disbursements reveals serious red flags," (*id.*); "very little, if any, economic development has been engaged in by the Foundations and Second Century," (*id.* at 8); "Second Century and the Foundations have also refused to respond to written requests for records," (*id.*); and "Second Century and the Foundations countered by pursuing this lawsuit, asserting a right to extend their inefficient use of East Chicago riverboat revenues in perpetuity." (*Id.* at 9.)

In the Statement of Case in its brief on the consolidation issue, East Chicago attributes to Judge Bradford "a belief that he had discretion ... to unilaterally transfer the case to

## FACTS AND PROCEDURAL HISTORY[2]

In 1994 and 1995, East Chicago and the Showboat Marina Partnership entered into two agreements providing for Showboat's distribution of some of its gam-

himself on the ground of 'judicial economy' without satisfying the standards of Ind. Trial Rule 42," (Appellant's Br. Regarding Consolidation (hereinafter "East Chicago Consolidation Br.") at 5), then refers to what it characterizes as "an odd dance ... in which counsel for the Foundations attempted to get Judge Bradford to reverse course." (*Id.* at 6.)

Despite these numerous violations of our rules, we choose to address, to the extent possible, the arguments raised in East Chicago's brief in the hope of advancing the resolution of this long-standing dispute. *See Chesterfield Mgmt., Inc. v. Cook,* 655 N.E.2d 98, 100–101 (Ind.Ct.App.1995):

We agree that portions of Cook's Statement of the Facts are argumentative; their argumentative nature prevented us from relying upon them in considering the parties' arguments and impeded our consideration of this appeal. We do not find, however, that Cook's Statement of the Facts is so infected with argument as to warrant striking it. Our denial of the Tenants' motion to strike the argumentative portions of Cook's Statement of the Facts in no way expresses a tolerance of appellate rule violations.

(citations omitted), *reh'g denied, trans. denied.*

We must also address East Chicago's presentation of its various arguments and its responses to its opponents' arguments. East Chicago has characterized various arguments by the Foundations or Second Century as "bait and switch," (Appellant's Br. at 35), a "transparent effort at legal 'sleight of hand,' " (Appellant's Reply Br. with Cross–Appellee's Br. (hereinafter "East Chicago Reply Br.") at 6)), a "slick device," (*id.* at 7), "specious," (*id.*), "a scattershot of undeveloped arguments," (*id.* at 12), an "incredible position," (*id.* at 16), a "[n]eat trick," (*id.*), "sophistry," (*id.*), "disingenuous," (*id.* at 39), "patently misleading and unfair," (*id.*), "fiction," (*id.*), "ludicrous," (*id.* at 44), and "silly." (*Id.* at 26.) East Chicago accuses its opponents of seeking to force the contract on East Chicago with "catatonic zeal," (*id.* at 26), and seeking to enforce it with "ferocity." (*Id.* at 27.)

ing revenue if it were awarded the license to operate the East Chicago riverboat casino. To secure a riverboat license, an applicant must show a commitment to local economic development, Ind.Code § 4–33–6–7(b),[3] so East Chicago negotiated with Showboat, the original licensee, that if East Chicago supported the Showboat application, Showboat would fund economic development with 3.75% of its future adjusted gross receipts. The agreement was dated April 8, 1994 and supplemented with a second agreement dated April 18, 1995. The agreements (hereinafter "the letter agreements") were subject to ratification by the East Chicago Common Council. The Council passed an ordinance in September 1995 endorsing the Showboat commitments.

Pursuant to the agreement Showboat would pay 1% to each of the Foundations, 1% to East Chicago, and .75% to Second Century. The Foundations are both not-for-profit entities. Second Century is a for-profit corporation Showboat formed. Showboat was awarded the license in April 1997, and the Indiana Gaming Commission incorporated the terms of the letter agreements as conditions for Showboat's receipt of the license. Showboat made the pay-

Finally, it accuses the Foundations of a "pejorative-filled rejoinder," (*id.* at 41), to one of East Chicago's arguments.

We direct East Chicago's counsel to our statement in *Amax Coal Co. v. Adams*, 597 N.E.2d 350, 352 (Ind.Ct.App.1992), *trans. denied*, where we said:

We must first discuss the quality of briefing by counsel in this appeal. Throughout the parties' briefs, they have launched rhetorical broadsides at each other which have nothing to do with the issues in this appeal. Counsels' comments concern their opposite numbers' intellectual skills, motivations, and supposed violations of the rules of common courtesy. Because similar irrelevant discourse is appearing with ever-increasing frequency in appellate briefs, we find it necessary to discuss the easily-answered question of whether haranguing condemnations of opposing counsel for supposed slights and off-record conduct unrelated to the issues at hand is appropriate fare for appellate briefs.

At the outset, we point to the obvious: the judiciary, in fact and of necessity, has absolutely no interest in internecine battles over social etiquette or the unprofessional personality clashes which frequently occur among opposing counsel these days. Irrelevant commentary thereon during the course of judicial proceedings does nothing but waste valuable judicial time. On appeal, it generates a voluminous number of useless briefing pages which have nothing to do with the issues presented, as in this appeal.

Further, appellate counsel should realize, such petulant grousing has a deleterious effect on the appropriate commentary in such a brief. Material of this nature is akin to static in a radio broadcast. It tends to blot out legitimate argument.

On a darker note, if such commentary in appellate briefs is actually directed to opposing counsel for the purpose of sticking hyperbolic barbs into his or her opposing numbers' psyche, the offending practitioner is clearly violating the intent and purpose of the appellate rules. In sum, we condemn the practice, and firmly request the elimination of such surplusage from future appellate briefs.

A brief should not only present the issues to be decided on appeal, but it should be of material assistance to the court in deciding those issues. *Young v. Butts*, 685 N.E.2d 147, 151 (Ind.Ct.App.1997). A brief is far more helpful to this court, and it advocates far more effectively for the client, when its focus is on the case before the court and not on counsel's opponent. The "petulant grousing" and "hyperbolic barbs" East Chicago offers in its brief, and that we condemned in our *Amax* decision, do not suffice as the "cogent argument" our appellate rules have long been interpreted to require. *See County Line Towing*, 714 N.E.2d at 290–91. We commend counsel for the Foundations and Second Century to the extent they have avoided responding in a similar tone to East Chicago's arguments.

3. East Chicago relies on this statute, but it appears to apply only to the city of Gary.

ments accordingly. In 1999 the license was transferred to Harrah's, with Gaming Commission approval, and Harrah's continued to make the payments called for in the letter agreements.

In the fall of 2004, RIH Acquisitions, doing business as Resorts East Chicago ("Resorts"), applied to the Gaming Commission for transfer of the Harrah's license to Resorts. Resorts indicated it was willing to continue making the payments. The Gaming Commission granted the license transfer without addressing the letter agreements.

In 2004, our Supreme Court ordered a special mayoral election in East Chicago because of election fraud on the part of Mayor Robert Pastrick's supporters. George Pabey was elected mayor. In January 2005 the new city administration took office and the Common Council passed an ordinance that purported to redirect to East Chicago all the money that was being paid to Second Century and the Foundations pursuant to the letter agreements.

In April 2005, Second Century brought an action against Resorts, seeking a declaration that it was a third-party beneficiary of the agreement Resorts had with East Chicago, so if the license were transferred Second Century would continue to be paid .75% of the riverboat's adjusted gross revenues.

Resorts answered and brought a third-party complaint against the Foundations and East Chicago asking the court to declare to whom it has to pay the money for East Chicago economic development. In response East Chicago asked that the letter agreements be found void and unenforceable, and contended it should receive the entire 3.75%. The Foundations an-

swered and asked the court to declare the letter agreements valid and to declare them entitled to their 1% each. The Foundations and Second Century moved to dismiss the East Chicago claims and East Chicago moved for summary judgment. The court granted a stay of discovery pending resolution of the motion to dismiss.

The Attorney General filed an *amicus* brief supporting East Chicago.[4] The Attorney General determined there were financial irregularities in the internal operations of Second Century. It determined the letter agreements "may violate the integrity of the riverboat gambling industry," (App. at 2192), as they direct the economic benefit money to a private, for-profit corporation that has "resist[ed] any public oversight," (*id.*), and the principals of Second Century and the previous East Chicago administration may have made material omissions and/or misrepresentations to the Indiana Gaming Commission in obtaining and maintaining the agreement made. It also determined the letter agreements may be "inconsistent with the stated purpose of the Act to assist economic development" as East Chicago may not have received economic development from Second Century "commensurate" with the amount of money Second Century received under the letter agreements. (*Id.*) The Attorney General suggested the letter agreements may be void as against public policy.

After the Attorney General's findings, and about a year after Second Century brought its declaratory judgment action, the Gaming Commission issued a resolution disapproving continued payments by Resorts to Second Century. Many of the irregularities alleged in the Gaming Com-

---

4. The Attorney General filed what is styled as an *amicus* brief. Its motion before the trial court to appear as *amicus* was never granted but its motion to intervene was. (App. at 130.) The Attorney General has been granted leave to appear as *amicus* in this appeal.

mission's resolution mirror the issues raised in the civil contract action. In addition, East Chicago argues in the civil action, as the Attorney General suggested in the Commission proceeding, the letter agreements are void as against public policy. Due to these similarities, the Foundations moved to consolidate the contract action with the appeal of the Gaming Commission's administrative decision.

After consolidating the actions, the trial court denied East Chicago's motion for summary judgment and found the letter agreements created an enforceable contract. Second Century and the Foundations moved to dismiss East Chicago's counterclaims alleging fraud and breach of fiduciary duty. Because East Chicago's counterclaims were dismissed on limitations grounds,[5] the trial court did not consider the other grounds for dismissal asserted by Second Century and the Foundations.

East Chicago initiated this interlocutory appeal. It argues the trial court was without authority to consolidate the actions, the trial court erred in dismissing East Chicago's claims on limitations grounds, dismissal on other grounds was improper because a number of factual inferences in East Chicago's favor were ignored, and the letter agreements are unenforceable for a number of reasons.

## CONSOLIDATION

■ East Chicago argues consolidation was improper because the Marion County Rules do not permit Judge Bradford's "unilateral action," (Appellant's Br. at 8), the two actions are "fundamentally dissimilar," (*id.*), consolidation is inconsistent with the purposes of the Administrative Orders and Procedures Act, consolidation will result in delay, and the administrative review proceeding should have been venued[6] in Lake County. Because East Chicago has not demonstrated it was prejudiced by the consolidation, we affirm.

### 1. *The Marion County Rules*

■ East Chicago asserts Judge Bradford could not "transfer a case to himself," (Appellant's Br. at 13), because under the Marion County Rules authority to *assign* judges rests with the executive committee of the Superior Court. It is apparent the cases had been "assigned" to Judges Bradford and Moberly of the Marion Superior Court well before they were consolidated, and East Chicago offers no explanation why the "assignment" rule would override, or even be relevant to, the trial rule that governs consolidation of cases.

■ We accordingly decline to reverse on that ground. *See* App. R. 46(A)(8) ("The argument must contain the conten-

---

**5.** One counterclaim survived the motions to dismiss. The trial court found East Chicago's claim that Second Century breached its contract with East Chicago by failing to provide an accounting was subject to a ten year limitations period. *See* Ind.Code § 34–11–2–11 ("An action upon contracts in writing other than those for the payment of money ... must be commenced within ten (10) years after the cause of action accrues."). As we find that count should have been dismissed on other grounds, we need not address whether the letter agreements amount to contracts "other than those for the payment of money" to which that limitations period applies.

**6.** East Chicago did not assert venue as one of the issues to be certified for this interlocutory appeal. We accordingly decline to address it. *See Thornton–Tomasetti Engineers v. Indianapolis–Marion County Public Library,* 851 N.E.2d 1269, 1280 (Ind.Ct.App.2006) ("inasmuch as the issues regarding the protective order were not certified for appeal ... we decline to address those claims and grant the Library's motion to dismiss that portion of appeal").

tions of the appellant on the issues presented supported by cogent reasoning. Each contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on.") A party waives an issue where he fails to develop a cogent argument or provide adequate citation to authority and portions of the record. *Lyles v. State*, 834 N.E.2d 1035, 1050 (Ind. Ct.App.2005), *reh'g denied, trans. denied* 841 N.E.2d 191 (Ind.2005).

### 2. Consolidation of Administrative Review Action with Civil Lawsuit

■ East Chicago asserts Ind. Trial Rule 42 does not permit consolidation of an administrative review proceeding with a civil lawsuit. Nothing in that rule explicitly distinguishes administrative review actions from the other "civil actions involving a common question of law or fact" the rule addresses. T.R. 42.

East Chicago asserts "an agency review proceeding is not a 'civil action' in the traditional sense." (East Chicago Consolidation Br. at 16.) It offers decisions it characterizes as holding "special statutory proceedings have not generally been considered 'civil actions,'" (*id.*), and the trial rules "are not applicable to proceedings before administrative agencies...." (*Id.* at 17.) However, the question before us is not whether the trial rules apply to the proceedings before the administrative agency. Rather, it is whether they govern the *review*, in civil court, of such proceedings. They do.

In *City of Mishawaka v. Stewart*, 261 Ind. 670, 674, 310 N.E.2d 65, 67 (Ind.1974), our Indiana Supreme Court said, "Numerous cases have held that proceedings for judicial review of decisions of Board of Public Works and Safety concerning dismissals of policemen or firemen are 'in the nature of civil proceedings.'" It noted the

trial rules "govern the procedure and practice in all courts of the state of Indiana in all suits of a civil nature whether cognizable as cases at law, in equity, or of statutory origin." *Id.* While the trial rules apply to "all suits of a civil nature," and the administrative review proceeding before the Court was "in the nature of a civil proceeding," the Court determined "the meaning is synonymous." *Id.*

Therefore, this administrative review proceeding is a civil action, and whether consolidation is permitted is therefore governed by T.R. 42, which provides in pertinent part:

When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

\* \* \* \* \* \*

When civil actions involving a common question of law or fact are pending in different courts, a party to any of the actions may, by motion, request consolidation of those actions for the purpose of discovery and any pre-trial proceedings.

Such motion may only be filed in the court having jurisdiction of the action with the earliest filing date and the court shall enter an order of consolidation for the purpose of discovery and any pre-trial proceedings unless good cause to the contrary is shown and found by the court to exist.

■ The rule permits a trial court to consolidate actions that involve a common question of law or fact, if the common questions of law or fact are determinative. *Bodem v. Bancroft*, 825 N.E.2d 380, 382

(Ind.Ct.App.2005). The decision to consolidate actions is purely discretionary and will be overturned only when a manifest abuse of discretion is established. *Id.* A showing of prejudice is a prerequisite to a finding the discretion of the trial court was abused in the grant or denial of a motion to consolidate. *Jessop v. Werner Transp. Co.,* 147 Ind.App. 408, 412, 261 N.E.2d 598, 601 (1970).

 East Chicago argues at length that the consolidation order "arbitrarily interfered with the case assignment process thereby disrupting the orderly administration of justice," (East Chicago Consolidation Br. at 8), and it implicated "the concern over judge or forum shopping." (*Id.* at 9.) However, East Chicago does not explicitly argue it is prejudiced by the consolidation of the two cases except to note "[c]onsolidation was not sought until weeks after Judge Bradford issued substantive rulings in favor of the City's opponents." [7] (*Id.* at 10.) East Chicago does not explain what those "substantive rulings" were or how the rulings demonstrat-

ed East Chicago would be prejudiced by the consolidation.[8]

 For an error to be prejudicial, it must affect the substantial rights of the appellant and the appellant must affirmatively show an erroneous, prejudicial ruling. *Foster v. Review Bd. of Ind. Employment Sec. Div.,* 413 N.E.2d 618, 621 (Ind. Ct.App.1980). We will not "indulge contrary presumptions to sustain appellant's alleged error." *Id.* We decline East Chicago's invitation to indulge such a presumption, and hold East Chicago has not affirmatively shown prejudice to its substantial rights just because the judge under which the cases were consolidated had made rulings in favor of East Chicago's opponents.[9] Consolidation of the two actions was not prejudicial error.

## VALIDITY AND ENFORCEABILITY OF THE AGREEMENTS

The trial court properly denied East Chicago's motion for summary judgment.

---

7. Judge Bradford has since been appointed to this court. We accordingly do not find prejudice on the "judge shopping" basis as Judge Bradford will not decide the consolidated case.

8. In its reply brief, East Chicago asserts for the first time it was prejudiced because "[o]f course, delay is in itself prejudice." (East Chicago Reply Br. at 15.) It cites *Smith v. Harris,* 861 N.E.2d 384, 386 (Ind.Ct.App. 2007), *trans. denied* 869 N.E.2d 457 (Ind. 2007). Smith, whom we described as a "[v]eteran *pro se* litigant," *id.* at 384, brought a complaint that was dismissed for failure to prosecute. We noted the length of and reason for the delay were factors to be weighed in determining whether such a dismissal was error. But we did not state, or even suggest, a litigant is necessarily prejudiced by delay, without more. That decision therefore does not support East Chicago's assertion delay "is in itself prejudice." We admonish East Chicago's counsel to refrain from so misrepresenting the authority on which it relies.

Nor will we presume consolidation of cases necessarily delays the proceedings. In fact, the opposite is often true. *See, e.g., State v. Baysinger,* 272 Ind. 236, 238, 397 N.E.2d 580, 582 (Ind.1979) ("For convenience and to avoid unnecessary cost and delay, all of these appeals are consolidated.").

9. While we resolve the consolidation issue on East Chicago's failure to show prejudice, we note there are "common question[s] of law or fact" that are "determinative." *Bodem v. Bancroft,* 825 N.E.2d 380, 382 (Ind.Ct.App. 2005). In both cases East Chicago wants redirected to itself the money that is now distributed to Second Century and the Foundations pursuant to the letter agreements. East Chicago's requests for relief in both actions are based primarily on the same facts, and both involve common legal questions about the validity of the agreements and the oversight of the recipients of the funds.

It correctly determined East Chicago's request for injunctive relief was, in effect, a request to reform the agreements to redirect the payments from Second Century and the Foundations to East Chicago. It declined to reform the agreements, as East Chicago had not alleged mutual mistake or fraud. It denied the request for a declaratory judgment the agreements were terminated, unenforceable, or void as against public policy. It found the agreements specific enough to be enforceable because they included an implied durational term, and found Second Century and the Foundations were intended to be third-party beneficiaries. It acknowledged East Chicago's concern the agreements did not provide sufficient oversight of Second Century and the Foundations, but found those concerns did not overcome the preference for freedom to contract. The denial of summary judgment was not error.

Our summary judgment standard of review is well-settled. The party appealing the denial of summary judgment, here East Chicago, has the burden of persuading us the trial court's ruling was improper. *Ind. Dept. of Transp. v. Shelly & Sands, Inc.*, 756 N.E.2d 1063, 1069 (Ind.Ct. App.2001), *trans. denied* 774 N.E.2d 512 (Ind.2002). When we review the denial of a motion for summary judgment, we apply the same standard as the trial court. *Id.* We will resolve any doubt as to a fact or an inference to be drawn from the evidence in favor of the party opposing the motion, here Second Century and the Foundations. *Id.* Summary judgment should be granted only when the designated evidence shows there is no genuine issue as to any material fact and the mov-

ing party is entitled to judgment as a matter of law. *Id.;* Ind. Trial Rule 56(C). Therefore, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. 756 N.E.2d at 1069.

### 1. *Duration of the agreement*

■ East Chicago argues the contract represented by the letter agreements is terminable at will, either because it is of infinite duration or it has an "implied durational term of the length of the original license which has long since expired." (Appellant's Br. at 10.) The trial court found the letter agreements had "no explicit durational term. However, by linking funding to gross gaming receipts, which only exist as a result of a valid gaming license, the letter agreements contain an implied durational term coterminous with the duration of the gaming license." (App. at 58.) Denial of East Chicago's motion for summary judgment on that ground was not error.

■ A contract that provides for continuing performance and has no ending date, or that provides it will last indefinitely, is terminable at will by either party. *House of Crane Inc. v. H. Fendrich, Inc.*, 146 Ind.App. 478, 481, 256 N.E.2d 578, 579 (1970). As there is no explicit end point, East Chicago asserts, it could terminate the agreement anytime. Further, East Chicago asserts, the only term that could properly be implied is the original five-year term of the license,[10] after which it could terminate the agreement at any

---

10. East Chicago does not acknowledge in its brief, or address the effect of, its continued compliance with and benefit from the challenged provisions of the letter agreement for some five years after the original license was transferred to another licensee. East Chicago does state in its reply brief the Foundations "apparently missed the part of the hornbook reciting the general rule that estoppel does not apply to the actions of public officials." (East Chicago Reply Br. at 13) (internal quotation omitted).

time.[11] The original license was issued to Showboat on April 15, 1997, and its initial term expired April 15, 2002. At that time its license would no longer exist unless the Commission renewed it. The only time period referred to in the letter agreements was the first five years of licensure, over which Showboat projected the value of the incentives it would give East Chicago.

Second Century asserts the contract is not of "indefinite duration," and therefore not terminable at East Chicago's will, because it includes a condition that would cause it to end, *i.e.*, the revocation, cancellation, or non-renewal of the gambling license. It relies on *Marksill Specialties, Inc. v. Barger*, 428 N.E.2d 65 (Ind.Ct.App. 1981), where Marksill contended an agreement was terminable at will by either party because there was no specific end date. The agreement provided that in return for

R.B.I. Sales' efforts in securing new accounts, Marksill would pay R B.I. a commission based on the amount of sales to Dexter Axle Company. The agreement was to continue as long as the R.B.I. agent "sells any product to any company listed." *Id.* at 67.

There, as in the case before us, no ending date was specified. Still, we found the *Marksill* agreement was not of indefinite duration: "The representative agreement provided that the commission would be paid so long as Marksill continued to sell certain products to Dexter Axle. The contract is therefore neither a lifetime, nor a perpetual contract, but rather, a contract terminable upon the happening of a certain condition." *Id.* at 68. The agreement, "containing a provision for termination, is terminable in accordance with its terms

---

**11.** It is not apparent why "termination" of the agreement would lead to the result East Chicago is seeking, *i.e.*, why the "multimillion dollar annual revenue stream at issue," (Appellant's Br. at 9), would continue to exist at all, let alone be directed entirely to East Chicago, after "termination."

In its motion for partial summary judgment, East Chicago asked the court to "redirect such revenues to the City," (App. at 585), but at the same time sought a "judgment that any contract that existed has long since expired and is no longer enforceable," (*id.* at 586), and asserted "no contract existed." (*Id.*) It asserts the Foundations and Second Century "were never intended to receive enforceable third party beneficiary rights" and "the only intended beneficiaries of the negotiations between East Chicago and the licensees were the residents of East Chicago." (*Id.*) But there is no explanation why the residents of East Chicago would continue to be "beneficiaries" of a non-existent contract. (*See* Br. of the Appellee Foundations (hereinafter "Foundations Br.") at 23 ("If the agreements were found invalid, then East Chicago, too, would not be entitled to receive any funds thereunder. The City's only theory for diversion to it of funds that the agreements designated would be paid to the Foundations was its 'reformation' claim.").)

In addition to its reformation argument, East Chicago argues the funds were dedicated to public use. Therefore, it invites us to impose a trust over the funds held by Second Century and the Foundations and order they be turned over to East Chicago. East Chicago states:

Upon a decision for any reason (including lack of a durational term or lack of third party beneficiary status) that the letter agreement is not enforceable and that trust funds are therefore not properly in the Corporations' possession the Court should order that all riverboat funds held by the Corporations be turned over to the city.

(East Chicago Reply Br. at 33.)

Because we do not find the agreements unenforceable for any of those reasons, we decline East Chicago's invitation to redirect to it all the gaming funds at issue via the imposition of a constructive trust. *See Drudge v. Brandt*, 698 N.E.2d 1245, 1250 (Ind.Ct.App.1998) (constructive trust is an equitable remedy imposed where there has been actual or constructive fraud and a breach of a confidential or fiduciary relationship. "It is not a vehicle for rewriting a contract improvidently entered which may no longer reflect the wishes of at least one of the parties.").

and not at the will of either party." *Id.* at 69.

The East Chicago agreement is explicit that the money distributed pursuant to the contract is from gross gaming revenues, and the Gaming Commission must require a license applicant to provide assurances economic development will occur in the city where the facility is located. Ind. Code § 4–33–6–7. Revocation of a gaming license is therefore one condition that might terminate the licensee's contractual obligation. Because that condition might amount to an "implied durational term" that would prevent the agreement from being terminable at will by East Chicago, the trial court properly denied summary judgment.[12]

### 2. *Termination or Reformation of the Contract*

■■■■ Even if the contract was terminable at will, Second Century asserts, East Chicago could not accomplish that purpose by means of the 2005 ordinance that purported to terminate it. We agree. If the ordinance terminated the contract, then "all rights to payment from the licensee's adjusted gross receipts would be terminated, even the City's." (Br. of Appellees, East Chicago Second Century, Inc., Michael A Pannos, and Thomas S. Cappas (hereinafter "Second Century Br.") at 11.) Instead, "the ordinance attempts to change the terms of the Agreement to redirect all of the payments to the City," (*id.*), and one party cannot unilaterally make changes to a contract. *See Stelko Elec., Inc. v. Taylor Cmty. Schools Bldg. Corp.*, 826 N.E.2d 152, 159 (Ind.Ct.App.2005) (one party to a contract may not make unilateral changes

to it; parties may voluntarily modify contracts, but such modifications are also contracts and require all the elements of a contract). We agree with the trial court that East Chicago is, in effect, seeking reformation and is therefore is not entitled to summary judgment unless it has made the showings necessary to permit that "extreme remedy." *Strong v. Jackson*, 777 N.E.2d 1141, 1150 (Ind.Ct.App.2002), *trans. denied* 792 N.E.2d 44 (Ind.2003).

■■■■ A trial court may reform a written document only where one party mistakenly executed a document that did not express the true terms of the agreement, and the other party has acted under the same mistake, or has acted fraudulently or inequitably while having knowledge of the other party's mistake. *Harlan Bakeries, Inc. v. Muncy*, 835 N.E.2d 1018, 1030 (Ind.Ct.App.2005). A mutual mistake has occurred if there has been a meeting of the minds and an agreement actually entered into, but the document in its written form does not express what the parties intended. *Id.* Reformation for mistake is available only if the mistake is one of fact, not of law. *Id.*

■■■ East Chicago does not explicitly allege fraud as a basis for reformation. Nor does it explicitly argue there was mutual mistake or that Second Century and the Foundations acted fraudulently or inequitably while knowing of East Chicago's "mistake." Instead, it argues for the first time in its reply brief that we may apply the "blue pencil" doctrine to delete from the agreements any reference to Second Century and the Foundations.

---

**12.** On this review of the denial of summary judgment we need not, and do not, hold the parties necessarily continue to be bound by the agreement until or unless the license is revoked. Rather, we hold only that East Chicago was not entitled to summary judgment on the ground the agreement was of infinite duration or that its only possible "implied durational term" was of the length of the original license.

Under that doctrine, if a covenant is clearly separated into parts and some parts are reasonable and others are not, the contract may be held divisible and the reasonable restrictions may be enforced. *Smart Corp. v. Grider,* 650 N.E.2d 80, 83 (Ind.Ct.App.1995), *reh'g denied, trans. denied.* But even if the covenant as written is not reasonable, the courts may not create a reasonable restriction under the guise of interpretation; to do so would subject the parties to an agreement they had not made. *Id.* Blue-penciling must be restricted to applying terms that already clearly exist in the contract; a court's redaction of a contract may not result in the addition of terms that were not originally part of the contract. *Id.* "Simply put, if practicable, unreasonable restraints are rendered reasonable by scratching out any offensive clauses *to give effect to the parties' intentions.*" *Id.* (emphasis supplied). East Chicago has not directed us to any ambiguity as to the parties' intentions in the letter agreements, and we decline its invitation to reform, by "blue-penciling" or otherwise, this unambiguous contract.

### 3. *Third Party Beneficiaries*

East Chicago asserts it should have been granted summary judgment because the Foundations and Second Century are not third-party beneficiaries and therefore may not enforce this contract. Both are third-party beneficiaries.

One who is not a party to a contract may enforce the contract by demonstrating it is a third-party beneficiary. *Nat'l Bd. of Exam'rs for Osteopathic Physicians & Surgeons, Inc. v. American Osteopathic Ass'n,* 645 N.E.2d 608, 618 (Ind. Ct.App.1994). A third-party beneficiary contract exists when (1) the parties intend to benefit a third party; (2) the contract imposes a duty on one of the parties in favor of the third party; and (3) the performance of the terms of the contract renders a direct benefit to the third party intended by the parties to the contract. *Id.*

Among these three factors, the intent of the contracting parties to benefit the third party is the controlling factor. *Id.* Such intention may be demonstrated by naming the third party, or by other evidence. *Id.* The necessary intent is not a desire or purpose to confer a particular benefit upon the third party nor a desire to advance his interest or promote his welfare, but an intent that the promising party or parties shall assume a direct obligation to him. *Id.*

East Chicago argues the letter agreements do not show an intent to benefit Second Century and the Foundations because the funds the agreements oblige the riverboat to pay are to be used for economic development of East Chicago; Second Century and the Foundations, it asserts, were "merely conduits for the citizens of East Chicago, the true intended beneficiaries...." (Appellant's Br. at 14.) Because the Foundations and Second Century are mere "conduits," (*Id.*), for money to be used for economic development of East Chicago, East Chicago argues, the Foundations and Second Century were not "the focus of benefits," (*id.*), and "the letters do not evidence an intent *to benefit* them." (*Id.* at 13) (emphasis in original).

This argument does not acknowledge the relevant intent as stated in the *Osteopathic Physicians* decision, *i.e.,* an intent that the promising party or parties shall *assume a direct obligation* to the third party, and not a desire or purpose to *confer a particular benefit* on the third party. We decline to hold Second Century and the Foundations cannot be third-party

beneficiaries on the ground they are "conduits."

As the Foundations note, "[b]ecause non-profit entities by definition exist to benefit others (rather than earn profit for themselves) the City's 'conduit' thesis would effectively preclude charities and other non-profit groups from ever being third-party beneficiaries." (Foundations' Br. at 22.) We agree, and find summary judgment was properly denied because Second Century and the Foundations are third-party beneficiaries.

East Chicago also argues third-party beneficiaries should not be recognized in a "public contract"[13] such as this one because "[n]on-parties should not be permitted to control a government contract in opposition to the will of the government." (Appellant's Br. at 15.) It relies on *Jenne v. Church & Tower, Inc.*, 814 So.2d 522 (Fla.Dist.Ct.App.2002), where Jenne, the sheriff, claimed he was a third-party beneficiary of a contract between the county and Church & Tower for construction of a jail.

The *Jenne* court applied a test similar to ours:

[T]he test is ... that the parties to the contract intended that a third person should be benefited by the contract. It is the undertaking on the part of the promisor, as a consideration to the promisee, to benefit the third person, that gives rise to a cause of action by the beneficiary against the promisor, resting upon the contract itself.

*Id.* at 524.

That contract did not name or otherwise mention the sheriff, but he argued the parties intended he be a beneficiary because the contractor's proposal noted the sheriff's approval for certain actions would be needed, and the contractor acknowledged it would be working together with the sheriff.

The court found this did not indicate intent that the sheriff would be a third-party beneficiary: "Negotiations and dealings between the parties cannot modify a written contract to create the parties' 'intent' when the lack of such intent is evident from the contract." *Id.* at 525.

The court also addressed the "public" nature of the contract:

The very nature of this contract precludes the Sheriff from assuming third-party beneficiary status. The Broward County/Church & Tower contract involved the construction of a public facility funded by the County. The contract was intended to directly and primarily benefit the citizens of Broward County, not the Sheriff, the public servant charged with operating the detention center. The Sheriff received only "incidental or consequential benefit from its enforcement," so he was precluded from suing for a breach of it.

*Id.* at 525.

East Chicago characterizes this statement as the court's recognition that "third

---

**13.** Throughout its brief, East Chicago characterizes the letter agreements before us as a "public contract." However, it does not, in its brief or reply brief, offer a definition of "public contract" or an explanation why this contract for the distribution of funds derived by the riverboat licensee, a private enterprise, is such a "public" contract. We therefore decline to address whether this contract is "public" or to address those arguments by East Chicago that are premised on its unexplained characterization of the contract as "public." *See* App. R. 46(A)(8) ("The argument must contain the contentions of the appellant on the issues presented, supported by cogent reasoning. Each contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on, in accordance with Rule 22.").

party beneficiaries should not generally be recognized in public contracts because citizens are the intended beneficiaries." (Appellant's Br. at 15.) There is no such explicit or implicit holding in *Jenne*, and *Jenne* was not decided on that ground.

 · Moreover, *Jenne* is distinguishable. Sheriff Jenne was not mentioned in the contract, while the East Chicago letter agreements explicitly name Second Century and the Foundations, and specify the percentage of the riverboat receipts that will be directed to each. As the *Jenne* court noted, "the language used in a contract is the best evidence of the intent and meaning of the parties." 814 So.2d at 524. We decline East Chicago's invitation to hold an entity that is explicitly mentioned in a contract can never be a third-party beneficiary just because there might be a "public" aspect to the contract.

### 4. *Public Funds*

The trial court found the agreements were not void as against public policy because East Chicago's argument, "allocating large amounts of economic development funding without stringent oversight is unwise," (App. at 59), did not overcome the strong preference for freedom to contract.

 East Chicago's argument the letter agreements violate public policy is premised in large part on its assertion the funds paid to Second Century and the Foundations pursuant to the agreement are "public funds." Similarly, in its *amicus* brief the Attorney General characterizes the money as "local government public

funds," (Br. of the Attorney General as *Amicus Curiae* in Support of Appellant City of East Chicago at 8), and asserts "a contract to channel gambling revenues intended for local economic development to a private corporation contravenes the public interest." [14] (*Id.* at 7.)

We cannot reverse the denial of summary judgment on that basis. East Chicago relies on the "public funds" definition in Ind.Code § 36–1–8–9.5 and asserts its opponents ignored that "most obviously relevant statute." (East Chicago Reply Br. at 14.) A "development agreement" is an agreement between a licensed riverboat owner and a unit setting forth the licensed owner's financial commitments to support economic development in the unit. Ind. Code § 36–1–8–9.5(a). A "unit" is a county, municipality, or township. Ind.Code § 36–1–2–23. "Funds *received by a unit* under a development agreement are public funds[.]" Ind.Code § 36–1–8–9.5(b) (emphasis supplied).

East Chicago offers no explanation why those funds channeled directly to the Foundations and Second Century by a riverboat operator represent money "received by a unit" and we therefore cannot say the trial court erred in denying summary judgment to the extent it determined the funds at issue were not "public." We accordingly do not further address East Chicago's public policy arguments to the extent they depend on characterizing as "public" funds that were never "received" by East Chicago.[15]

As East Chicago was not entitled to summary judgment on the premise the

---

**14.** The Foundations direct us to evidence in the record that a number of other casinos in Indiana have similar revenue sharing agreements "entered by riverboat gaming operators and approved by the [Gaming Commission] ... under which many millions of dollars in gaming have been distributed to private entities." (Foundations Br. at 38.) Neither the Attorney General nor

East Chicago acknowledge the existence or address the validity of those agreements.

**15.** We do not decide whether funds such as those addressed in the letter agreements might ever, as a matter of law, be "public." Rather, we hold only that East Chicago was not entitled to summary judgment in this case on that basis.

funds were "public," we also decline to address its argument we should impose a constructive trust over the riverboat funds because the letter agreements violate public policy.

■ In addition to the arguments premised on its "public funds" characterization, East Chicago argues the agreement violates public policy because it does not follow Ind.Code § 36–1–14–1. East Chicago characterizes that statute as es-tablishing the process "for a local unit of government to direct contributions from a riverboat or other entity to a community foundation." (Appellant's Br. at 26.) The trial court properly declined to enter summary judgment on that basis, as it does not appear that statute applies to the agreement before us.

That section establishes conditions under which a local government unit may "donate the proceeds from ... a grant, a gift, a donation ... or riverboat gaming

---

In its reply brief East Chicago states the question whether the funds at issue here "are 'public funds' is in many respects irrelevant." (East Chicago Reply Br. at 14.) However, East Chicago does not there advance substantially different public policy arguments. East Chicago invites us to "adopt a common law definition of public funds and find that public contracts which fail to sufficiently protect such funds are against public policy." (*Id.* at 22.) As the legislature has explicitly defined "public funds" in the context of riverboat development agreements, we decline the invitation to adopt a presumably different common-law definition.

East Chicago also argues at some length the contracts violate public policy because the former East Chicago administration diverted "public opportunities," (Appellant's Br. at 24), in the form of the right to control the riverboat money, "to unaccountable private entities not subject to public oversight and without any means of insuring that the money would be used for any public purpose...." (*Id.* at 23–34.) It is not apparent such "public oversight" is lacking.

Ind.Code § 23–17–24–1 provides a court may dissolve a nonprofit corporation:

(1) In a proceeding by the attorney general if one (1) of the following is established:

(A) The corporation obtained the corporation's articles of incorporation through fraud.

(B) The corporation has continued to exceed or abuse the authority conferred upon the corporation by law.

(C) The corporation is a public benefit corporation and the corporate assets are being misapplied or wasted.

(D) The corporation is a public benefit corporation and is no longer able to carry out the corporation's purposes.

Under Ind.Code § 23–17–24–1.5(b), the attorney general has other remedies available:

In addition to a dissolution under section 1 of this chapter, the attorney general may petition a court to issue one (1) or more of the following remedies:

(1) Injunctive relief.

(2) Appointment of temporary or permanent receivers.

(3) Permanent removal of trustees, corporate officers, or directors who have breached the fiduciary duty.

(4) Appointment of permanent court approved replacement trustees, corporate officers or directors, and members.

Ind.Code § 23–17–4–4(b) provides: "A [nonprofit] corporation's power to act may be challenged in a proceeding against the corporation for a declaratory judgment or to enjoin an act where a third party has not acquired rights. The *proceeding may be brought by the attorney general* or a director." (Emphasis supplied.) Ind.Code § 23–1–47–1 provides for the Attorney General to bring proceedings for judicial dissolution of a for-profit corporation. Finally, Ind.Code § 4–6–3–3 provides if the attorney general has reasonable cause to believe a person may have information or documents relevant to a possible violation of any "statute enforced by the attorney general, *only the attorney general* may issue ... an investigative demand" to produce the material, answer interrogatories, or appear and testify under oath before the attorney general. (Emphasis supplied.)

East Chicago does not address these statutory provisions, nor does the Attorney General acknowledge in its *amicus* brief its own statutory oversight authority.

revenue to a foundation...." Ind.Code § 36–1–14–1. It defines "riverboat gaming revenue" as *"tax revenue received by a unit ... or an agreement to share a city's or county's part of the tax revenue." Id.* (emphases supplied). East Chicago offers no explanation why the contractual agreement by the riverboat licensee to contribute a portion of its revenues to Second Century and the Foundations converts those funds into "tax revenues" [16] or why those funds amount to a "donation," gift, or grant by East Chicago.[17] The agreement did not violate public policy on that basis.

### DISMISSAL ON LIMITATIONS GROUNDS

In the same order denying summary judgment, the trial court dismissed all but one of the East Chicago counterclaims, cross-claims and third party claims. It declined to dismiss an East Chicago claim that Second Century breached a contractual term in its agreement with East Chicago. We affirm the dismissals but hold the remaining claim should also have been dismissed.[18]

We note initially that the limitations period for a claim of breach of fiduciary duty is two years. *Del Vecchio v. Conseco, Inc.,* 788 N.E.2d 446, 451 (Ind.Ct. App.2003) (breach of fiduciary duty is a tort claim for injury to personal property and therefore the statute of limitation is two years), *trans. denied* 804 N.E.2d 749 (Ind.2003). East Chicago offers argument on what it characterizes as "[b]reach of contract claims," [19] (Appellant's Br. at 37),

---

**16.** The legislature addresses the disposition of riverboat gambling "tax revenue" in Ind.Code §§ 4–33–12–6 and 4–33–13–6.

**17.** East Chicago asserts there is "no dispute" the payments are a "donation" by East Chicago and the statute is "clearly applicable to the donation...." (East Chicago Reply Br. at 23.) While we acknowledge East Chicago's assertions, we remain mindful of our duty to implement legislative intent by giving effect to the ordinary and plain meaning of the language used in a statute. *Clifft v. Ind. Dep't of State Revenue,* 660 N.E.2d 310, 316 (Ind. 1995). We note that in a different part of its public policy argument, East Chicago calls the agreements "nothing more than a revenue sharing commitment." (East Chicago Reply Br. at 28.)

Because we find East Chicago's motion for summary judgment on public policy grounds was properly denied, we need not address the Foundations' argument the agreements were validated by Ind.Code § 5–1–1–1, which provided bonds and certain other written obligations issued or executed by a city before March 15, 2006 "are hereby legalized and declared valid...."

**18.** East Chicago addresses the limitations periods under the headings "Discovery of wrongdoing," (Appellant's Br. at 36), "Breach of contract claims," (*id.* at 37), and "Breach of trust claims." (*Id.* at 38.) However, it does not explicitly state in its argument which counts are subject to which limitations period, and some of its counterclaims and cross-claims are not presented as either contract or breach of trust issues. None of the counts are captioned "breach of trust"; rather, they seek such relief as an accounting, a declaratory judgment, or reformation, and assert unjust enrichment or breach of fiduciary duty. This has impaired our ability to review the propriety of the dismissals on limitations grounds. East Chicago has accordingly waived its arguments the alleged wrongdoing was discovered within the various limitations periods.

**19.** East Chicago's only contract-related count that was dismissed on limitations grounds was Count VIII, for reformation of the contract. The only "breach" of contract count East Chicago alleged was Count IX, which the trial court did not dismiss on limitations grounds. We accordingly do not address the application of the contract limitations period to Count IX.

As to Count VIII, East Chicago directs us to Ind.Code § 34–11–2–11, which provides:
An action upon contracts in writing other than those for the payment of money, and

and "Breach of trust claims," (*id.* at 38), for which it asserts the limitations periods are ten and six years, respectively. But nowhere in its brief or reply brief does East Chicago acknowledge the two-year limitations period for breach of fiduciary duty or explain why its claims were not brought within that period. We therefore are unable to address East Chicago's arguments with regard to Counts I, II, IV, V, VI, and VII [20] which are premised on allegations of breach of fiduciary duty. We are left, then, to address only Count III, "Constructive Fraud/Unjust Enrichment." (App. at 388).

▮▮▮ When a motion to dismiss is reviewed under T.R. 12(B)(6), we test the legal sufficiency of a claim, not the facts supporting it. *ServiceMaster Diversified Health Servs., L.P. v. Wiley*, 790 N.E.2d 1056, 1058–59 (Ind.Ct.App.2003), *reh'g denied, trans. denied* 812 N.E.2d 794 (Ind. 2004). Accordingly, we view the complaint in a light most favorable to the nonmoving party, here East Chicago, and draw every reasonable inference in favor of that party. *Id.* at 1059. The grant of a motion to dismiss is proper if it is clear the facts alleged in the complaint are incapable of supporting relief under any set of circum-

stances. *Id.* Generally, in making this determination we consider only the complaint and ignore other evidence in the record. *Id.* However, where allegations of a pleading are inconsistent with terms of a written contract attached as an exhibit, the terms of the contract, fairly construed, must prevail over an averment differing therefrom. *Eskew v. Cornett*, 744 N.E.2d 954, 957 (Ind.Ct.App.2001), *reh'g denied, trans. denied* 761 N.E.2d 418 (Ind.2001).

▮▮▮ The cause of action on a tort claim accrues and the statute of limitations begins to run when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of the tortious act of another. *Keep v. Noble County Dept. of Pub. Welfare*, 696 N.E.2d 422, 425 (Ind.Ct. App.1998), *trans. denied* 706 N.E.2d 179 (Ind.1998).

### 1. The Constructive Fraud Count

▮▮▮ In Count III, "Constructive Fraud/Unjust Enrichment," East Chicago alleged Second Century, its principals Michael Pannos and Thomas Cappas, and the Foundations "received funds from the East Chicago riverboat under circum-

including all mortgages other than chattel mortgages, deeds of trust, judgments of courts of record, and for the recovery of the possession of real estate, must be commenced within ten (10) years after the cause of action accrues.

That section does not apply to Count VIII, as an action for reformation is not an action at law brought *upon* the contract. Rather, it is an action for the equitable remedy of *reformation of* the contract. *Trip–Tenn, Inc. v. Schultz*, 656 N.W.2d 747, 751 (S.D.2003). *And see Langer v. Stegerwald Lumber Co.*, 262 Wis. 383, 55 N.W.2d 389, 393 (1952) (statute of limitations for equitable actions applied to an action for reformation of a contract to purchase real estate, rather than a statute of limitations for actions *upon* a contract), *reh'g denied* 262 Wis. 383, 56 N.W.2d 512 (1953).

As East Chicago does not direct us to an applicable statute of limitations or offer argument why this count for reformation was brought within the correct limitations period, we decline to address its allegation Count VIII should not have been dismissed. *See* App. R. 46(A)(8).

20. Count V is captioned "Accounting," (App. at 390), but it is premised on Second Century and the Foundations' "fiduciary duty ... to account for all funds received" from the riverboat. *Id.* Counts VI and VII are captioned "Declaratory Judgment/Return of Public Funds," (*id.* at 391, 393), but are premised on the allegation any agreement that funds would be paid from the riverboat directly to Second Century and the Foundations was approved as a result of a breach of fiduciary duty.

stances that would make the retention of the benefit unjust." (App. at 388.) East Chicago does not indicate what limitations period it believes governs its claims in Count III, nor does it argue the actions that gave rise to the claims happened during the limitations period. We therefore do not address the limitations issue as to Count III.

 Notwithstanding the City's waiver, we note the six-year statute of limitations for actions seeking relief against frauds applies to constructive, as well as actual, frauds. *Wells v. Stone City Bank,* 691 N.E.2d 1246, 1250 (Ind.Ct.App. 1998), *trans. denied* 706 N.E.2d 166 (Ind. 1998). East Chicago states in its reply brief the conduct that gave rise to the constructive fraud claim was "the activity of entering into" various agreements, (East Chicago Reply Br. at 36), none of which appear to have been entered into during the six years before the City brought its cross-claims and counterclaims. Count III was properly dismissed.

### 2. *Waiver*

 East Chicago argues Second Century and the Foundations waived their statute of limitations defense by bringing their declaratory judgment actions. They did not.

In *Kuehl v. Hoyle,* 746 N.E.2d 104 (Ind. Ct.App.2001), Kuehl alleged Hoyle's principal waived any defense to the expiration of the statute of limitation in Kuehl's tort case. Hoyle and the principal filed a motion for leave to file a third-party complaint against Hoyle's insurer, which motion was granted. That complaint alleged breach of contract, fraud, and failure to act in the interest of the insured, alleging the insurer failed to perform according to the terms of the policy. It "related to the

benefits he believed were owed pursuant to the insurance policy he carried on his vehicle and was in no way based on the actual facts of the accident." *Id.* at 109.

When the third-party complaint was filed, the two-year statute of limitation for the tort action had expired, so the principal was no longer subject to personal liability for the accident. We recognized that a party may, under certain circumstances, waive a statute of limitation defense by not raising it, but we found no waiver of a limitation defense to Kuehl's tort action by virtue of the third-party complaint for breach of contract, fraud, and failure to act in the interest of the insured. *Id.*

East Chicago's cross-claims and counterclaims did not concern the interpretation and effect of the contract, which was the subject of the declaratory judgment action brought by Second Century and the Foundations. Instead, East Chicago asserted breach of fiduciary duty (Count I and IV), inducement and/or participation in such breach (Count II), constructive fraud/unjust enrichment (Count III), and entitlement to an accounting (Count V). It also sought declaratory judgments that East Chicago may "change the designee," (App. at 392), of the funds due to breaches of fiduciary duty (Counts VI and VII) and that the contract could be reformed to provide all the funds would go to East Chicago (Count VII).

We decline to hold Second Century and the Foundations waived their limitations defense to the East Chicago cross-claims and counterclaims by bringing a declaratory judgment action to determine whether the agreements would be binding on a new riverboat licensee.

### 3. *Tolling of the Statute* [21]

 East Chicago first argues the running of the statute of limitations was

---

**21.** East Chicago argues, among other things,

that the statute of limitations does not run

tolled by virtue of the doctrine of adverse domination. That doctrine is "[t]he equitable principle that the statute of limitations on a breach-of-fiduciary-duty claim *against officers and directors* is tolled.as long as a corporate plaintiff is controlled by the alleged wrongdoers." Black's Law Dictionary 54 (7th ed.1999) (emphasis supplied). The adverse domination doctrine is based on the premise that a corporation may be so controlled by directors or officers engaged in wrongdoing that discovery of the misconduct is impossible. Therefore, the period for discovery of losses should be equitably tolled until the wrongdoers no longer control the entity.[22] *Mut. Sec. Life Ins. Co. by Bennett v. Fid. & Deposit Co. of Md.,* 659 N.E.2d 1096, 1102 (Ind.Ct.App. 1995), *trans. denied.*

The adverse domination doctrine "operates either to delay the accrual of a cause of action or to toll limitations *in situations involving claims by a corporation against*

*its officers and directors for injuries to the corporation."* *Martin Marietta Corp. v. Gould, Inc.,* 70 F.3d 768, 772 (4th Cir.1995) (emphasis supplied). That is not the situation before us. While East Chicago does make allegations its former mayor breached his fiduciary duties in various ways, Mayor Pastrick is not a party to this action and this is not in any other respect a claim "by a corporation against its officers and directors for injuries to the corporation." Assuming *arguendo* the doctrine applies in Indiana, it would not apply to toll the statute of limitations in this action by East Chicago against outside entities.[23]

■ Finally, East Chicago appears to argue the statute was tolled by fraudulent concealment of the Foundations' and Second Century's financial records. This argument appears to be premised on the Foundations' and Second Century's failure

---

against it because of the common law doctrine of *nullum tempus occurrit regi.* The maxim *nullum tempus occurrit regi* applies in favor of the sovereign power only, *i.e.,* the State. *See State v. Stuart,* 46 Ind.App. 611, 91 N.E. 613, 615 (1910) (the doctrine "has no application to municipal corporations deriving their powers from the sovereign, though their powers in a limited sense are governmental. Thus the statute runs for or against towns and cities, and also for or against counties."). We accordingly decline to find the East Chicago claims survive on that basis.

22. It is not clear the adverse domination doctrine applies in Indiana. The only Indiana decision East Chicago offers in support of its adverse domination argument is *Mutual Sec. Life Ins. Co. by Bennett v. Fid. & Deposit Co. of Md.,* 659 N.E.2d 1096 (Ind.Ct.App.1995), where we recognized there is such a doctrine, but said "Due to MSL's failure to designate facts to show adverse domination, we need not reach the issue of whether the theory should apply to the discovery of loss provision." *Id.* at 1102. *And see Resolution Trust Corp. v. O'Bear, Overholser, Smith & Huffer,* 840 F.Supp. 1270, 1284 (N.D.Ind.1993) (reaching its conclusion based on the "supposition" an Indiana court, faced with the facts

in that case, would apply the adverse domination doctrine to toll the statute of limitations until the board was no longer dominated by the defendants in that lawsuit.)

23. East Chicago offers no authority that supports its apparent premise the adverse domination doctrine applies to disputes between corporations and other entities. We note our statement in *INB Nat. Bank v. Moran Elec. Service, Inc.,* 608 N.E.2d 702, 707 (Ind.Ct. App.1993), *trans. denied:* "A statute of limitations can be extended only for legal disability, including incompetence, minority, imprisonment, nonresidency under certain circumstances, war, death in certain instances, and fraudulent concealment. The circumstances under which a statute of limitations can be extended are defined by statute." (Citations omitted). Under the facts before us we decline East Chicago's invitation to recognize a new exception to the running of the statute of limitations in the form of application of the adverse domination doctrine to litigants that are not corporate directors or shareholders who failed to bring an action against the corporation before the limitations period ran.

to disclose financial information in breach of what East Chicago asserts was their fiduciary duty to do so.[24] As we explained above, East Chicago does not acknowledge the two-year limitations period for breach of fiduciary duty or explain why its claims were brought within that period. Nor, despite its numerous characterizations of the Foundations as fiduciaries, does it explain how their fiduciary duty toward East Chicago might have arisen.

■■■■ We cannot say the limitations period was tolled by fraudulent concealment based on a fiduciary duty because East Chicago does not direct us to any allegations of dominance on the part of any of the alleged fiduciaries. A fiduciary relationship does not exist unless there is a relationship of trust and confidence between the parties. *Paulson v. Centier Bank*, 704 N.E.2d 482, 490 (Ind.Ct.App. 1998) (addressing the relationship between a lender and a borrower), *reh'g denied, trans. denied* 714 N.E.2d 174 (Ind.1999). A confidential relationship exists when confidence is reposed by one party in another with resulting superiority and influence exercised by the other. *Id.* Not only must there be confidence by one party in the other, but the party reposing the confidence must also be in a position of inequality, dependence, weakness, or lack of knowledge. *Id.* Furthermore, it must be shown that the dominant party wrongfully abused this confidence by improperly influencing the weaker so as to obtain an unconscionable advantage. No such behavior or relationship was alleged in the case before us.

### 4. *The Second Century Cross–Appeal*

■■■ On cross-appeal, Second Century argues East Chicago's breach of contract claim should have been dismissed. We agree. Count IX, the only one the trial court did not dismiss, asserts Pannos, Cappas, and Second Century "breached the Confirmation Agreement by failing to open its books and records to the City in order to permit the City to exercise the agreed-upon oversight," (App. at 397), and assure Second Century performed the duties described in the letter agreements.

The portions of the letter agreements that define Second Century's obligations require Second Century's projects be approved by East Chicago, conform with the comprehensive plan, and be directed to sites within East Chicago. East Chicago directs us to nothing in either agreement that requires Second Century to open its books and records to East Chicago,[25] and we decline to read such a provision into either agreement. East Chicago's Count IX accordingly should have been dismissed.

### CONCLUSION

East Chicago was not prejudiced by the consolidation of the civil court review of the administrative action and the summary

---

**24.** As best we are able to discern, this argument is directed to Count V. East Chicago does not indicate which count or counts are tolled for this reason, but it does, at one point in its argument, direct us to a page in the appendix where Count V is found.

**25.** East Chicago does not contend the contract obliges Second Century to provide an accounting or otherwise open its records to East Chicago. Instead, it asserts Second Century has a duty to provide an accounting because the funds held by Second Century "were subject to a constructive trust for the benefit of East Chicago." (East Chicago Reply Br. at 39.) As East Chicago offers no cogent argument why the existence *vel non* of a constructive trust and the obligations Second Century might incur under such a trust might demonstrate Second Century *"breached the Confirmation Agreement,"* (App. at 397) (emphasis supplied), we are unable to address that matter.

judgment and dismissal action. East Chicago's summary judgment motion was properly denied, and Counts I through VIII of its cross-claims and counterclaims were properly dismissed. However, the trial court should also have dismissed Count IX. We accordingly affirm in part, reverse in part, and remand.

Affirmed in part, reversed in part, and remanded.

SHARPNACK, J., concurs.

BAILEY, J., concurring in part, concurring in result in part with separate opinion.

BAILEY, Judge, concurring in part and concurring in result in part.

I concur in result, but write separately in light of the majority's conclusion that the letter agreements do not terminate until revocation of the gaming license. On all other issues, I concur.

As an initial matter I must note that, incredibly, East Chicago argues that the letter agreements are not enforceable, yet asks to receive increased payments through their enforcement. "[T]his Court should find that the letter agreement is void and unenforceable as a matter of law and that East Chicago was entitled to summary judgment...." Appellant's Brief at 44. In its motion, East Chicago asked the trial court to "bar the payment of further gaming revenues to Second Century and the Foundations, [and] redirect such revenues to the City...." App. at 585. If, as East Chicago suggests, the letter agreements are void, then it lacks any basis for its claim.

Accepting East Chicago's assertion that the letter agreements are void, the majority did not need to reach the issue of the contract's duration. However, if we must, I would agree with East Chicago and conclude that the letter agreements terminated after five years.[1] The 1995 letter refer-

1. In an Alice–in–Wonderland battle among those asserting entitlement to gambling revenues, East Chicago is the only party challenging the contract's duration. In its answer, Resorts asked the trial court to determine "the parties' respective rights under the Economic Development Letter Agreements in the event that the Commission approves the transfer of the Gaming License [to Resorts] and *includes as a condition of the Gaming License* that Resorts comply with the Economic Development Letter Agreements." *Id.* at 322 (emphasis added). Resorts apparently considered itself obligated to make the payments as a condition of receiving a gaming license to operate the assets purchased from Harrah's, but it did not admit to being bound by the letter agreements or by the series of subsequent agreements in 1998, 1999, and 2000. Resorts did not submit an appellate brief.

It does not appear that the current license requires compliance with the terms of the letter agreements. In originally licensing Showboat to operate the riverboat in East Chicago, the Commission attached the letter agreements as exhibits to its Certificate of Suitability and established the payments as a condition of licensure. In 1999, the Commission issued a license to Harrah's. Concluding that Harrah's had committed to honor the Showboat letter agreements, the Commission decided informally that "Second Century is a negotiated item in the economic development agreement," and that oversight of Second Century would be left to the City. App. at 2169, 2294.

Second Century brought the instant action on April 15, 2005. Six days later, in issuing a gaming license to Resorts, the Commission made no reference to the provisions of the letter agreements. On March 9, 2006, the Commission renewed the license. While the Commission established four conditions of licensure, none of them addressed the disputed payments. On June 8, 2006, the Commission passed "A Resolution Disapproving in Part the East Chicago Local Development Agreement." *Id.* at 2201–04. The Resolution disapproved of that portion of the letter agreements "requiring the riverboat licensee(s) to make payments to Second Century." *Id.* at 2202.

enced "the first 5 years of licensure," but contained no other terms regarding the contract's duration. *Id.* at 669. Per statute, the parties understood that the term of the original license would be five years. Ind.Code § 4–33–6–10(c) (1993) (ss). The parties also were aware that the license was issued to a gaming concern rather than the City or any other local entity. As such, there cannot be any reasonable expectation that the agreement would be effective beyond the original five-year term, as the majority concludes, especially where the license was not a property right (Ind. Code § 4–33–6–17(2) (1993) (ss)), was subject to revocation by the Commission at any time (I.C. § 4–33–6–17(1) (1993) (ss)), and statute requires annual renewal (Ind. Code § 4–33–6–12 (1993) (ss)). While the majority concludes that the letter agreements terminate upon a remote, improbable event, the practical effect of that decision binds the parties and their successors indefinitely. A contract that has no termination date or which provides that it will last indefinitely is terminable at will by *either* party. *See Ten Cate Enbi, Inc. v. Metz,* 802 N.E.2d 977, 982 (Ind.Ct.App. 2004) (citing *Marksill Specialties, Inc. v. Barger,* 428 N.E.2d 65, 69 (Ind.Ct.App. 1981)). Therefore, at most, there exists a contract terminable at will.

Regardless, the outcome is the same whether a contract exists or not. This Court cannot reward East Chicago's duplicity. For these reasons, I concur in result.